CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
NADINE C. HETTLE (Bar No. 149842)
(E-Mail: Nadine_Hettle@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-4790
Facsimile: (213) 894-0081

Attorneys for Defendant
BORIS MARADIAGA

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 20-54-ODW |
| Plaintiff, | |
| v. | **DEFENDANT'S POSITION RE; SENTENCING** |
| BORIS MARADIAGA | |
| Defendant. | |

Defendant Boris Maradiaga, by and through his attorney of record Deputy Federal Public Defender Nadine C. Hettle, hereby files Defendant's Position Re: Sentencing for the court's consideration prior to the sentencing hearing on September 26, 2023.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: September 21, 2023

By  */s/ Nadine C. Hettle*

NADINE C. HETTLE
Deputy Federal Public Defend

# **TABLE OF CONTENTS**

Page(s)

I. OBJECTIONS TO THE PRE-SENTENCE REPORT .................................................... 1

II. ARGUMENT ......................................................................................................... 1

    A.    The 3553(a) Factors ...................................................................... 1

        1.    Nature of the Offense .................................................. 1

        2.    History and Characteristics Mr. Maradiaga ................ 1

        3.    The Need for Medical Treatment ................................ 3

    B.    Sentencing Guidelines ................................................................ 5

        1.    Legal Standard ............................................................ 5

        2.    Mr. Maradiaga's conviction for a violation of Cal. Health &Safety §§ 11378 and 11379(a) are not Controlled Substance Offenses under U.S.S.G. § 2K2.1 and § 4B1.2(b) ..... 6

        3.    Cal. Health and Safety Code §§ 11378 and 11379 are categorically overbroad because California law defines a controlled substance analog more broadly than federal law. ...... 7

        4.    The modified categorical approach does not apply because the methamphetamine elements of California Health & Safety Code §§ 11378 and 11379(a) are not divisible ............... 11

        5.    Even if Cal. Health & Safety Code §§ 11378 and 11379 were divisible, the Government cannot establish that Mr. Maradiaga's December 6, 2004 conviction relates to a controlled substance under the federal CSA ............................ 13

        6.    The Honorable John F. Walter and the Honorable Dale S. Fischer have already sustained objections similar to Mr. Maradiaga's in *United States v. Jonathan Hernandez*, 22-00194-JFW and United States v. Dustin Louis Palmer, CR 22-223-DSF .......................................................................... 14

    C.    The Government Has Not Met Its Burden of Proving That a Two-Level Increase Is Warranted In Mr. Maradiaga's Offense Level For Possession of 3-7 Firearms. .......................................................... 15

III. CONCLUSION ................................................................................................... 17

i

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

Descamps v. United States,
570 U.S. 254 (2013) ...........................................................6, 12, 13

Lazo v. Wilkinson,
989 F.3d 705 (9th Cir. 2021) .....................................................5, 6

Lorenzo v. Whitaker,
752 F. App'x 482 (9th Cir. 2019).........................................11, 12, 13

Mielewczyk v. Holder,
575 F.3d 992 (9th Cir. 2009) .................................................5, 6, 14

United States v. Bautista,
989 F.3d 698 (9th Cir. 2021) ...........................................................5

United States v. Demott,
906 F.3d 231 (2d Cir. 2018) ..........................................................10

United States v. Hodge,
321 F.3d 429 (3d Cir. 2003) ..........................................................10

United States v. Makkar,
810 F.3d 1139 (10th Cir. 2015) ..................................................9, 11

United States v. Turcotte,
405 F.3d 515 (7th Cir. 2005) .....................................................9, 10

U.S. v. Wada,
323 F. Supp.2d 1079 (C.D.C. Oregon 2004).................................16

**State Cases**

*People v. Becker,*
*183 Cal. App. 4th 1151 (2010)* ...........................................*passim*

*People v. Davis,*
*57 Cal. 4th 353 (2013)*.....................................................................8

*People v. Puckett,*
*44 Cal. App. 3d 607 (Ct. App. 1975)* .........................................12

*People v. Schroeder,*
*70 Cal. Rptr. 491 (1968)* .............................................................12

*People v. Silver,*
*230 Cal. App. 3d 389 (Ct. App. 1991)* ......................................10

**Federal Statutes**

18 U.S.C. §921........................................................................*passim*

ii

# TABLE OF AUTHORITIES

Page(s)

18 U.S.C. § 922(g)(1) ................................................................................... 5

21 U.S.C. § 802 (32)(A)(i)-(iii) .................................................................... 9

21 U.S.C. § 812(c) ........................................................................................ 7

21 U.S.C. § 813 ............................................................................................ 8

U.S.S.G., Appendix A .................................................................................. 5

U.S.S.G. § 2K2.1 ................................................................................. *passim*

U.S.S.G. §4B1.2(b) ............................................................................... 5, 15

U.S.S.G. §6A1.3 Commentary ................................................................... 15

**State Statutes**

Cal. Health & Safety Code §§ 11377 ................................................. *passim*

Cal. Health & Safety Code §§ 11378 ................................................. *passim*

Cal. Health & Safety Code §§ 11379 ................................................. *passim*

Cal. Health & Safety Code § 11401 .................................................. *passim*

**Regulations**

21 C.F.R. §§ 1308.11–1308.15 ..................................................................... 7

**Other Authorities**

ACLU, COVID-19 Model Finds Nearly 100,000 More Deaths Than Current
    Estimates, Due to Failures to Reduce Jails,
    https://www.aclu.org/news/criminal-lawlreform/covid-19-is-not-over-for-
    people-who-are-incarcerated ................................................................. 4

UCLA Health, As COVID-19 cases rise, Should We Start Masking Again
    https://www.uclahealth.org/news/covid-19-cases-rise-should-we-start-
    masking-again ........................................................................................ 4

# DEFENDANT'S POSITION

## I.

## OBJECTIONS TO THE PRE-SENTENCE REPORT

**¶20-23 -Base Offense Level Calculation of 20 pursuant to 2K2.1(a)(2).**  For the reasons set forth below the defense submits that the appropriate base offense level is level 20 because Mr. Maradiaga does not have a controlled substance offense as defined by the U.S.S.G.

**¶24- Two Level Enhancement for 3-7 Firearms pursuant to 2K2.1(b)(1)(A).**  For the reasons set forth below, the defense submits that the government has not proven that the offense involved more than two firearms.

**¶59**- Mr. Maradiaga's father is 61 years old and not 54.

## II.
## ARGUMENT

### A.   The 3553(a) Factors

#### 1.   Nature of the Offense

The offense does not involve the use of firearms by Mr. Maradiaga, only possession of firearms and sales.  Prior to this offense, Mr. Maradiaga had no prior firearm offense convictions nor any and allegations that he ever used a firearm against another person or possessed a firearm.  While Mr. Maradiaga has one prior felony conviction  and one prior misdemeanor conviction for a crimes of violence, neither involve possessing a firearm.   See PSR at ¶¶42 and 44.  There is no indication that Mr. Maradiaga has every used a firearm in any crime.

#### 2.   History and Characteristics Mr. Maradiaga

Mr. Maradiaga's history is consistent with that of someone with a serious life long drug problem. He has a number of controlled substance offenses, theft, giving false identifying and driving without a license offenses.  He has an assault with great

1

bodily injury offense and an infliction of corporal injury on a spouse conviction, both of which appear to be substance abuse related.  The assault was connected to a burglary investigation, a common crime for drug addicts.  See PSR at ¶42.  The inflicting corporal injury on a spouse was related to a drug possession charge.  See PSR at ¶44.

Mr. Maradiaga used drugs for about thirty-five years --- from age fourteen to about age 49.  His drug use contributed to his bad judgment in this case and his other prior convictions.  However, he has changed his ways and has been clean for the last five years.

His drug use was a coping strategy in his teens for the abuse he suffered at home.  He grew up with neglect and abuse.  Both of his parents worked and he was often left unsupervised.  His mother suffered from lupus.  While she tried her best to be present, she was often preoccupied with her health problems.  PSR at ¶63.  His father could be abusive towards him.  When he was a teenager his father caught him smoking cigarettes and punched Mr. Maradiaga in the face.  PSR at ¶63.  His father  was a heavy drinker who would step out on his wife and family.  PSR at ¶63. When Mr. Maradiaga was a teenager, he begin to resent his father and started using drugs.

Mr. Maradiaga's addiction cost him his education, his freedom and his relationships.  In high school he begin using methamphetamine.  He begin getting into trouble and going to jail.  This had a negative impact on his education and he did not complete high school.  His mother passed away while he was in jail in 2004.  PSR at ¶65.  He married and had three children but because of his drug addiction, he was wasn't emotionally present and often not physically present.  PSR at ¶66.

After nearly thirty-five years of addiction, in 2018 he was advised by his doctor to quit methamphetamine and smoking or die an early death.  At that point, he thought moving out of the area to Arizona to help him severe bad associations and start anew.  His situation improved and he was able to achieve sobriety.  In  2020 he was driving from Arizona to California and fell asleep at the wheel.  He was in a serious accident that changed his life.  He received a head injury and was in a coma for 45 days.  Since

2

the accident he suffers from lymphedema. Lymphedema means his lymph systems is unable to drain fluid from his body. He utilizes a wheelchair and walker for mobility. Sometimes he is unable to walk, shower or care for himself. PSR at ¶74. Lymphedema has seriously damaged his kidneys. He also suffers from chronic pain, type II diabetes, obesity, chronic obstructive pulmonary disease, and congestive heart failure. He often has difficulty breathing. See PSR at ¶¶72-79. In November of 2022, he was hospitalized for about three months. See PSR at ¶74,

Since the offense, Mr. Maradiaga has faced his own mortality in the most severe way. The pain he suffers ever day to survive has made him want to fight for his life and his continue his sobriety. Every day he lives with the destruction that drugs had on his health and is committed not to use. He has been clean and sober for the last five years and has not tested positive while on pre-trial supervision He is not the same man he was at the time of the offense.

### 3. The Need for Medical Treatment

Incarcerating Mr. Maradiaga will disrupt the care that he is now receiving for his various serious health issues. In addition, incarceration could jeopardize his life. The BOP of Prisons is struggling to implement reforms to its medical care. The BOP is facing staffing shortages that are comprising their ability to deliver healthcare up to the standards they've implemented for prisoner care. See Walter Pavlo, Personal Finance, Federal Bureau of Prisons' Medical Care Falls Short of Its Own Policy, Forbes Magazine, April 19, 2022. An audit performed by Umass indicated that the BOP faced challenges in transporting inmates to off-site appointments which resulted in frequent rescheduling of appointment. The BOP does not have a system to track and monitor the causes that result in rescheduled medical appointments. Nor does the BOP have a process to monitor how long a patient waited to have their appointment reschedule. One senior medical person in an unnamed federal institution indicated that the institution was without a pharmacist for most of 2022 because the pharmacist was out n medical leave. The official reported "[W]e now have several psychiatric patients

decompensating daily.  We also have many diabetics, hypertensives, cardiomyopathy and HIV inmates that have run out of medications and have no way of refilling them until they, as well as emergent issues, or are lucky enough to communicate the need to executive staff. Or custody staff who communicate to Medical.  . . . There are currently OVER 750 unfilled prescriptions." *Id*. A staff member at another institution  who submitted the plea for help to the Office of the Inspector General stated in writing "THIS IS UNACCEPTABLE, DANGEROUS.  Literally a powder keg awaiting an explosion." *Id*.

In addition, COVID-19 still poses a threat to inmate with serious health problems.  While the worst of COVID may appear to be over, it is still a dangerous virus to people like Mr. Maradiaga with his health problems. Living in close quarters like those present in prisons still pose a risk for people who are immunocompromised like Mr. Maradiaga.  The number of prisons deaths dramatically arose in the last three years due to COVID.  The ACLU believes in-custody deaths from COVID are underreported due to institutions releasing individuals who were suffering from COVID before they died and brought down prison statistics.  ACLU, COVID-19 Model Finds Nearly 100,000 More Deaths Than Current Estimates, Due to Failures to Reduce Jails, https://www.aclu.org/news/criminal-lawlreform/covid-19-is-not-over-for-people-who-are-incarcerated.  Given that COVID case appear to be on the rise again, increasing prison population infections are a concern.  UCLA Health, As COVID-19 cases rise, should we start masking again?, uclahealth.org, https://www.uclahealth.org/news/covid-19-cases-rise-should-we-start-masking-again.

Mr. Maradiaga's health problems will make it difficult for his to fend for himself in prison.  He will have greater difficulty having access to a healthy diet.  He will be a greater risk of violence due to his mobility problems.

4

**B.   Sentencing Guidelines**

    **1.   Legal Standard**

Under the Guidelines, the offense level for violations of 18 U.S.C. § 922(g)(1) is calculated pursuant to U.S.S.G. § 2K2.1. *See* U.S.S.G., Appendix A at 563. Under U.S.S.G. § 2K2.1(a)(2), the base offense level for a violation of Section 922(g) is 24 if the defendant "committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(2). In contrast, the base offense level for a violation of Section 922(g) is only 20 if the defendant committed the offense of conviction subsequent to sustaining just one felony conviction for either a crime of violence or a controlled substance offense. U.S.S.G. § 2K2.1(a)(4). The advisory notes to U.S.S.G. §2K2.1 explain that a "controlled substance offense" as used in § 2K2.1 is defined in U.S.S.G. §4B1.2(b). U.S.S.G. § 2K2.1, cmt. 1.

In turn, U.S.S.G. § 4B1.2(b) defines the term "controlled substance offense" as "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a *controlled substance* (or a counterfeit substance) or the possession of a *controlled substance* (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispenses." U.S.S.G. § 4B1.2(b) (emphasis added). The term "controlled substance" in U.S.S.G. § 4B1.2(b) only includes drugs covered by the federal Controlled Substances Act ("CSA"). *United States v. Bautista*, 989 F.3d 698, 702-03 (9th Cir. 2021). "A state drug statute is therefore categorically overbroad if it includes substances other than those listed in the federal CSA." *Id.* at 704.

When a state drug statute is "categorically overbroad," it can only serve as a "controlled substance offense" under the sentencing guidelines if the Government proves that certain criteria are met by applying the "modified categorical approach." *See Mielewczyk v. Holder*, 575 F.3d 992, 995 (9th Cir. 2009); *see also Bautista*, 989 F.3d at 705 ("Bautista's conviction is facially overbroad and not a categorical match for

a 'controlled substance offense,' and the district court erred in applying the recidivist sentencing enhancement for a controlled substance.").  Under the modified categorical approach, the Government—not the defendant—bears the burden of establishing that the defendant's conviction under the state statute included, as an element, a controlled substance listed in the federal CSA.  *Mielewczyk*, 575 F.3d at 995-96.  Prior to applying the modified categorical approach, courts "must first consider whether [the state statute] is 'divisible,' meaning that it lists elements [of the offense] in the alternative, and thereby defines multiple crimes."  *Lazo v. Wilkinson*, 989 F.3d 705, 710–11 (9th Cir. 2021) (cleaned up).  If the statue does set out alternative offenses with different elements, then courts may only consult "a limited class of documents, such as indictments and jury instructions, to determine which alternative formed the basis of the [defendant's] prior conviction."  *Id.*  "In deciding whether . . . a state statute sets forth alternative elements or means, a court should consider any authoritative sources of state law, such as the statutory text or controlling decisions of the [relevant] state courts."  *Id.* at 711 (cleaned up).

However, if the state statute is not divisible, the inquiry ends and the statute cannot serve as a "controlled substance offense" under the sentencing guidelines.  *See Descamps v. United States*, 570 U.S. 254, 258 (2013) ("[C]ourts may not apply the modified categorical approach when the crime of which the defendant was convicted has a single, indivisible set of elements.").  This is because the modified categorical approach "serves a limited function," specifically "effectuat[ing] the categorical analysis when a divisible statute, listing potential offense elements in the alternative, renders opaque which element played a part in the defendant's conviction."  *Id.* at 260.

### 2.  Mr. Maradiaga's conviction for a violation of Cal. Health &Safety §§ 11378 and 11379(a) are not Controlled Substance Offenses under U.S.S.G. § 2K2.1 and § 4B1.2(b)

Applying relevant law, Mr. Maradiaga's  convictions under Cal. Health & Safety Code §§ 11378 are not controlled substance offenses as defined under U.S.S.G. §§

6

2K2.1 and § 4B1.2(b).  As an analysis of Cal. Health & Safety §§ 11378 and 11379(a) and its associated caselaw reveals, §§ 11378 and 11379(a) define controlled substance more broadly than federal law.  Moreover, the Ninth Circuit has held that the controlled substance elements under Cal Health & Safety § 11378 and 11379(a) are not divisible.  That is, the  overbreadth of these statutes result in their automatic exclusion from the Guidelines' definition of a controlled substance offense.  Finally, even if the Court finds that Cal. Health & Safety §§ 11378 and/or 11379(a) are divisible and applies the modified categorical approach, Probation's use of the criminal complaint from Mr. Maradiaga's December 6, 2004 conviction is insufficient evidence to establish that the substance he was convicted of possessing for sale was a controlled substance under the federal CSA.  For the reasons described below, the Court should sustain Mr. Maradiaga's objections and hold that his  December 2004 conviction in OCSC Case 04WF2620 is not a controlled substance offense and cannot be used to enhance his base offense level.

### 3.  Cal. Health and Safety Code §§  11378 and 11379 are  categorically overbroad because California law defines a controlled substance analog more broadly than federal law.

As an initial matter, Cal. Health & Safety Code §§ 11378 and 11379(a) are categorically overbroad when compared to the federal CSA because they extend to "controlled substance analogs" that are not covered by the federal CSA.  Cal. Health  & Safety  §§ 11378 and 11379(a) prohibit certain acts relating to statutorily defined controlled substances, such as "[m]ethamphetamine, its salts, isomers, and salts of its isomers."  *See* Cal. Health & Safety Code §§ 11378(5) and/or §11379(a)(5) (citing California Health & Safety Code § 11055(d), which defines "[m]ethamphetamine, its salts, isomers, and salts of its isomers" as a Schedule II controlled substance).  Similarly, federal law identifies a variety of different drugs as controlled substances.  *See* 21 U.S.C. § 812(c); *see also* 21 C.F.R. §§ 1308.11–1308.15.  Critically, both federal and state law extend the definition of a controlled substance to include

controlled substance analogs.  *See* Cal. Health & Safety Code § 11401(a) ("A controlled substance analog shall, for the purposes of [the statutory chapter including Cal. Health & Safety Code §§11378 and 11379], be treated the same as the controlled substance classified in Section 11054 or 11055 of which it is an analog."); 21 U.S.C. § 813 ("A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I.").

Importantly, however, California law defines controlled substance analogs more broadly than federal law.  Under California law, a substance is a controlled substance analog if it meets either of two independent statutory criteria, one relating to the substance's chemical structure and one relating to its actual or intended effect on the central nervous system:

> "[T]he term 'controlled substance analog' means *either* of the following:
>
> (1) A substance the chemical structure of which is substantially similar to the chemical structure of a controlled substance classified in Section 11054 or 11055.
>
> (2) A substance which has, is represented as having, or is intended to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to, or greater than, the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance classified in Section 11054 or 11055."

Cal. Health & Safety Code § 11401(b) (emphasis added).

The word "either" in Cal. Health and Safety Code § 11401(b) imposes disjunctive criteria; submitting evidence of either of the criteria set out in Cal. Health & Safety Code §§ 11401(b)(1) or (b)(2) is independently sufficient to establish that a substance is a controlled substance analog.  *See People v. Becker*, 183 Cal. App. 4th 1151, 1156 (2010).  In other words, a "jury may find [a substance] is a controlled substance or analog based on evidence of [its] chemical composition *or* its effects on the user."  *People v. Davis*, 57 Cal. 4th 353, 359 (2013) (emphasis added).

8

In contrast, the federal CSA defines controlled substance analogs more narrowly. Rather than requiring proof of only one of two criteria, the CSA requires a substance to meet statutory criteria relating to *both* the chemical structure of the substance and actual or intended effects of the substance on the central nervous system:

> "[T]he term 'controlled substance analogue' means a substance—
>
> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
>
> (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or
>
> (iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II."

21 U.S.C. § 802 (32)(A)(i)-(iii).

Understandably, the wording of § 802(32)(A) has caused great confusion among lawyers, jurists, and jurors alike. *See e.g., United States v. Turcotte*, 405 F.3d 515, 522 (7th Cir. 2005) ("[T]he text of the Controlled Substances Act analogue provision is not a model of clarity."). The source of confusion from the federal definition stems from the word "which" in subsections (ii) and (iii), which can call for a disjunctive or conjunctive reading depending on the preceding word it refers to. *Id.* ("The word 'which' in the beginning of clauses (ii) and (iii) could be construed to refer either to 'substance' in the preface of the definition (favoring a disjunctive reading) or to 'chemical structure' in clause (i) (favoring a conjunctive reading).").

Though this federal definition is worded unusually, courts have generally agreed that—unlike the California definition of a controlled substance analog—it requires a substance to meet *both* the criteria related to chemical structure and the criteria related to actual or intended effect on the central nervous system. *See, e.g.*, *United States v. Makkar*, 810 F.3d 1139, 1146 (10th Cir. 2015) ("As written, [federal law] makes it a

9

crime to possess or distribute a drug that *both* (1) is substantially similar in chemical structure to a schedule I or II CSA controlled substance, and (2) has, or is represented or intended to have, an effect on the central nervous system that is substantially similar to that of a schedule I or II CSA controlled substance.") (emphasis added); *see also Turcotte*, 405 F.3d at 522 (observing that "the vast majority of federal courts to confront this issue have adopted the conjunctive reading" and collecting cases from a variety of district courts and the Third, Fourth, Eighth, and Second Circuits).  Courts holding that § 802(32)(A) is worded conjunctively have cited both the plain text of the statute and its legislative history, both of which support a conjunctive reading.  *See United States v. Hodge*, 321 F.3d 429, 438 (3d Cir. 2003) (conducting review of both plain text and legislative history of § 802(32)(A) and concluding that conjunctive reading is appropriate).

Unlike some differences between the CSA and Cal. Health & Safety Code § §11378 and 11379, this distinction has real implications for criminal defendants in California.  California has used its overbroad definition of controlled substance analogs to prosecute and convict defendants under Cal. Health & Safety Code §§ 11378 and 11379.  *See, e.g.*, *People v. Silver*, 230 Cal. App. 3d 389 (Ct. App. 1991) (upholding conviction under HSC § 11378 and 11379 related to an analog of methamphetamine where charging instrument "neither mentioned section 11401 nor alleged that [the analog at issue] is an analog of methamphetamine"); *People v. Becker*, 183 Cal. App. 4th 1151 (2010) (upholding convictions under Cal. Health & Safety Code §§ 11378 and 11377 related to an analog of methamphetamine where violation of analog statute was not alleged).  By contrast, federal courts have reversed convictions under the federal CSA where jury instructions effectively relieved the prosecution of proving the substance at issue met the CSA's narrower definition of a controlled substance analog.  *See United States v. Demott*, 906 F.3d 231, 242 (2d Cir. 2018) (reversing convictions for improperly narrow jury instructions and observing that the Government must prove both "substantial similarity to a Schedule I or II controlled substance in chemical

10

structure *and* actual, intended, or represented effect on the central nervous system" in a prosecution under the CSA for an analog) (emphasis in original); *see also Makkar*, 810 F.3d at 1146 (reversing conviction for improper jury instructions and holding the same).

Because a defendant in California can be convicted of violating Cal. Health & Safety Code §§ 11378 or 11379 by simply possessing for sale *either* a substance with a similar chemical structure of a controlled substance *or* a substance which has, is represented as having, or is intended to have a similar effect as a controlled substance, but could not be so prosecuted federally, Cal. Health & Safety Code §§ 11378 and 11379 are categorically overbroad and are not controlled substance offense under the Sentencing Guidelines.

### 4. The modified categorical approach does not apply because the methamphetamine elements of California Health & Safety Code §§ 11378 and 11379(a) are not divisible

Because California law defines controlled substance analogs more broadly than federal law, Mr. Maradiaga's conviction under California Health and Safety Code § 11378 and 11379(a) can only constitute a "controlled substance offense" if the Government establishes that (1) Cal. Health & Safety Code §§ 11378 and 11379(a) are divisible and (2) using the modified categorical approach, that Mr. Maradiaga's December 6, 2004 conviction related to a controlled substance as defined by the federal CSA. But the Government cannot even clear the first hurdle of their burden: as a matter of law, the elements of Cal. Health and Safety Code §§ 11378 and 11379 prohibiting possession for sale of methamphetamine are not divisible.

State and federal courts have already recognized that the controlled-substance elements of offenses under California Health & Safety §§ 11378 and 11379(a) are not divisible, i.e., they do not create separate crimes. *See Lorenzo v. Whitaker*, 752 F. App'x 482, 486 (9th Cir. 2019) ("[T]he methamphetamine element applicable to a

11

1    conviction under Health & Safety Code § 11378 … is not divisible, because the

2    different varieties of methamphetamine covered by California law are alternative means

3    of committing a single crime rather than alternative elements of separate crimes.");

4    *People v. Schroeder*, 70 Cal. Rptr. 491, 499 (1968) (holding that possession of different

5    types of the same controlled substance, e.g., different types of methamphetamine,

6    "would constitute a single offense").  This is further confirmed by the text of the

7    California statute defining controlled substance analogs, which mandates that "[a]

8    controlled substance analog shall… be treated the same as the controlled substance…

9    of which it is an analog."  Cal. Health & Safety Code § 11401(a).  Because the Cal.

10   Health and Safety Code § 11378 is overbroad and not divisible, it cannot serve as a

11   "controlled substance offense" under the sentencing guidelines.  *See Descamps*, 570

12   U.S. at 258.

13          Under the Cal. Health & Safety code and case law interpreting it, *Lorenzo*

14   extends to analogs of methamphetamine.  The California statute defining controlled

15   substance analogs mandates that "[a] controlled substance analog *shall… be treated the*

16   *same* as the controlled substance… of which it is an analog."  Cal. Health & Safety

17   Code § 11401(a) (emphasis added).  If Cal. H & S §§ 11378 and 11379(a) each created

18   one offense for a controlled substance and a separate offense for its analogs—and they

19   do not—then California law would require charging documents to specify whether

20   charges relate to a controlled substance or its analog.  This is because in California

21   "[a] person cannot be convicted of an offense, not charged against him in the

22   indictment or information, whether or not there was evidence at trial to show that he

23   committed the offense."  *People v. Puckett*, 44 Cal. App. 3d 607, 611 (Ct. App. 1975).

24   Consistent with this, California courts have held that due process does not require

25   charging documents alleging violations of California drug laws, including California

26   Health & Safety Code § 11378, to specify that the substance at issue is a controlled

27   substance analog under the overbroad California statute.  *See Becker*, 183 Cal. App. 4th

28   at 1157 ("Moreover, for due process purposes there was no need to allege that Ecstasy

                                              12

1    was an *analog* of a controlled substance as opposed to a controlled substance, for

2    purposes of section 11378.")

3         Because the methamphetamine elements of California Health Safety Code §

4    §11378 a n d 1 1 3 7 9 ( a ) are overbroad and not divisible, convictions under either

5    or both of these statutes are not controlled substance offenses under the sentencing

6    guidelines. *See Descamps*, 570 U.S. at 258. Therefore, just as in *Lorenzo*, the Court

7    cannot use the modified categorical approach to consider records from Mr. Maradiaga's,

8    December 6, 2004 conviction under Cal. Health & Safety Code §§ 11378 and 11379.

9

10   **5. Even if Cal. Health & Safety Code §§ 11378 and 11379 were**

11        **divisible, the Government cannot establish that Mr. Maradiaga's**

12        **December 6, 2004 conviction relates to a controlled substance under**

13        **the federal CSA**

14        Even if this Court finds that either of Cal. Health & Safety Code §§ 11378 and

15   11379 are divisible and applies the modified categorical approach, the criminal

16   complaint cited in the PSR as justification for finding a controlled substance offense

17   does not establish that Mr. Maradiaga's conviction actually relates to a controlled

18   substance covered by the federal CSA. The government may attempt to reference the

19   complaint from Mr. Maradiaga's 2004 conviction and argue that it confirms that Mr.

20   Maradiaga was found guilty of possessing methamphetamine for sale. Yet under existing

21   California law, a charging document is not a reliable basis to determine whether the

22   defendant possessed a controlled substance under the federal CSA or a controlled

23   substance analog under California's overbroad statute.

24        As explained above, California does not require charging documents to specify

25   whether a prosecution relates to a controlled substance or its analog. In *Becker*, for

26   instance, "the information alleged only that Ecstasy was a controlled substance, not a

27   controlled substance analog, and did not mention [the statute defining controlled

28   substance analogs]." 183 Cal. App. 4th at 1156. Nonetheless, the prosecution proceeded

at trial on the theory that Ecstasy was an analog of methamphetamine.  Despite this discrepancy, the California Court of Appeal found the defendant's due process rights were not violated and upheld the conviction.  *Id.* at 1157.  Thus, under California law, a criminal complaint accusing Mr. Maradiaga of possessing methamphetamine for sale is insufficient to establish whether he was actually convicted of possessing methamphetamine or a methamphetamine analog.  And under the modified categorical approach, the relevant question is whether the government has carried its burden of showing that "the conviction involved a substance that is not only listed under California law, but also contained in the federal schedules of the CSA."  *Mielewczyk*, 575 F.3d at 995 (quotations omitted).  Because the Government cannot establish that Mr. Maradiaga's December 6, 2004 conviction was for a controlled substance offense even under the modified categorical approach, the Court should sustain Mr. Maradiaga's objection.

6. **The Honorable John F. Walter and the Honorable Dale S. Fischer have already sustained objections similar to Mr. Maradiaga's in *United States v. Jonathan Hernandez*, 22-00194-JFW and United States v. Dustin Louis Palmer, CR 22-223-DSF**

Finally, while no appellate authority addressing this exact issue exists to instruct the Court in its decision, at least two other judge in this District have already ruled on and adopted Mr. Maradiaga's arguments.  In *United States v. Jonathan Hernandez*, 2:22-cr-00194-JFW, the Honorable Judge Walter held that Cal. Health & Safety Code §§ 11378 and 11379 are categorically overbroad because the California statutes define a controlled substance analog more broadly than the federal CSA.  Judge Walter also held that neither statute was divisible, and that even if the modified categorical approach applied, the defendant's charging document was insufficient to establish that the defendant was found guilty of possessing a federal controlled substance for sale— citing *Becker* for the proposition that charging documents in California do not require that prosecutors allege whether the defendant possessed a controlled substance or a

14

controlled substance analog.  Accordingly, Judge Walter held in an almost identical situation that Mr. Hernandez's prior convictions under Cal. Health & Safety Code §§ 11378 and 11379 for possession of methamphetamine for sale were not "controlled substance offense[s]" for purposes of U.S.S.G. §4B1.2(b).[1]

In *United States v. Dustin Louis Palmer*, CR 2:22-cr-223-DSF, the Honorable Dale S. Fischer did not enhance defendant's base offense level under 2K2.1 because of a conviction for Cal. Health & Safety Code §11378.  Her ruling adopted the analysis of Judge Walter in *United States v. Hernandez*, CR 22-194-JFW.[2]

**C.   The Government Has Not Met Its Burden of Proving That a Two-Level Increase Is Warranted In Mr. Maradiaga's Offense Level For Possession of 3-7 Firearms.**

The government bears the burden of proving that Mr. Maradiaga possessed 3-7 firearms by a preponderance of the evidence.  See Commentary U.S.S.G. §6A1.3.  The PSR justifies a two level enhancement based on there being three firearms - 1) the two purchased by the CI in this case and 2) and one he allegedly personally possessed during the transaction with the UC on December 18, 2018." PSR at ¶25.  The PSR mentions that Maradiaga showed the UC one of his personal handguns, a 1911 style .45 caliber, which he said he purchased for $1,400 in Arizona.  PSR at ¶11.  The government's position simply adopts the reasoning of the PSR regarding this enhancement adding no further argument.

---

[1] Although Judge Walter has not issued a written ruling for his rationale, Defense Counsel possesses the transcript for the sentencing hearing in which Judge Walter cited *Becker* and articulated his reasoning.  Because the transcript has not been redacted and filed publicly, and because the transcript contains sensitive information pertaining to the defendant in that case that is under seal, Defense Counsel has not filed the transcript with this objection.  Defense Counsel is happy to provide the unredacted transcript upon request by the Court to both the Court and the Government.

[2] See 2:22-cr-223-DSF, Dkt. 68, Transcript of 4-17-23 Sentencing Hearing at p. 12, lines 17-25.

However, this alleged gun was not recovered and there is no proof that it met the actual definition of a firearm.  Under the guidelines, a "firearm' has the meaning given that term in 18 U.S.C. §921(a)(3).  See Commentary to U.S.S.G. §2K2.1.  A

The term "firearm" is defined in 18 U.S.C. §921(a)(3)to mean:

> (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (b) the frame or receiver of any such weapon; (c) any firearm muffler or firearm silencer; or (d) any destructive device.  Such term does not include an antique firearm.

The government must prove that the items it seeks to count as 'firearms' pursuant to U.S.G. §2K2.1(b)(1)(D) were, in fact 'firearms' as defined by the pertinent statute at the time" the defendant committed the offense.  *U.S. v. Wada*, 323 F. Supp.2d 1079 (C.D.C. Oregon 2004).  In *Wada*, a firearms dealer sold formerly operable firearms as props, their fundamental character was changed so they could not be fired and could not easily been returned to a state where they could be fired.  The court did not include these items as firearms and did not apply the enhancement pursuant to U.S.S.G. §2K2.1.  This case underscores the need to inspect so called firearm in every case.  In fact, the government does so as part of every firearms case where the firearm is recovered.  In this case, no firearm was recovered.  There is no surveillance of a firearm being fired.  There is insufficient proof that this gun met the definition of a firearm.

//

//

//

16

## III.

## CONCLUSION

In sum, Mr. Maradiaga does not have two prior felony convictions for a controlled substance offense as defined under the Guidelines.  His base offense level should therefore be 20 under U.S.S.G. § 2K2.1(a)(6) because he has only one predicate offense that is a crime of violence.  In addition, the government has not met its burden that Mr. Maradiaga had more than two firearms.  Therefore, the two level enhancement pursuant to §2K2.1(b)(A) should not be applied. In turn, that figure should be reduced by 3 points for acceptance of responsibility.  The resulting adjusted offense level of 21—when combined with his Criminal History Category of VI—should result in a Guidelines range of 77 to 96  months imprisonment.

The court should consider recommending that the BOP allow Mr. Maradiaga to participate in the RDAP program and that he be housed at a BOP facility that at least provides level 3 care.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  September 21, 2023          By   /s/ Nadine C. Hettle

NADINE C. HETTLE
Deputy Federal Public Defender
Attorney for BORIS MARADIAGA

17